<u>ORAL ARGUMENT NOT YET SCHEDULED</u>

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | | |
|---|---|---|
| Western States Trucking Association, Inc. & Construction Industry Air Quality Coalition, Inc., | ) ) ) | |
| *Petitioners*, | ) ) | |
| v. | ) ) ) | No. 23-1143 & consol. cases |
| Environmental Protection Agency & Michael S. Regan, in his official capacity as Administrator of the United States Environmental Protection Agency, | ) ) ) ) | |
| *Respondents*. | ) ) | |

**MOTION OF ENVIRONMENTAL JUSTICE ORGANIZATIONS TO INTERVENE IN SUPPORT OF RESPONDENTS**

East Yard Communities for Environmental Justice and People's Collective for Environmental Justice ("Environmental Justice Intervenors") respectfully move under Fed. R. App. P. 15(d) to intervene in support of respondents U.S. Environmental Protection Agency ("EPA") and Michael S. Regan (collectively, "Respondents") in Case No. 23-1143 and all consolidated petitions for review of EPA's final actions published as *Waiver of Preemption; Decision: California State Motor Vehicle and Engine Pollution Control Standards; Heavy-Duty Vehicle and Engine Emission Warranty and Maintenance Provisions; Advanced Clean Trucks; Zero Emission Airport Shuttle; Zero-Emission Power Train Certification*, 88 Fed. Reg. 20688 (Apr. 6, 2023) ("Waiver Decisions"). *See* Cir. R. 15(b).

1

Respondents in all consolidated cases and Petitioners in Case No. 23-1146 take no position on this motion. Petitioners in Case No. 23-1144 do not oppose this motion. Petitioners in Case Nos. 23-1143, 23-1145, 23-1147, and 23-1148 did not respond to requests for a position on this motion.

## INTRODUCTION

Heavy-duty trucks are one of the largest sources of health-harming air pollution in the country. Diesel exhaust, nitrogen oxide ("NOx"), and particulate matter 2.5 micrometers or smaller ("PM2.5") are deadly pollutants that lead to the formation of soot and smog and cause a slew of debilitating adverse health outcomes. Although they make up just a small fraction of vehicles on the road, diesel-powered trucks have outsized negative impacts on the health and well-being of nearby communities, regional air quality, and our ability to ensure a livable climate.

A large portion of heavy-duty truck pollution remains concentrated in freight hubs, like ports, highways, warehouses, and railyards. People who live near these facilities and roadways—dubbed "diesel death zones" by a local emergency physician in the Los Angeles region—tend to be low-income communities of color exposed to disproportionately high concentrations of pollution from various other diesel-fueled pieces of equipment, rail, and vessels. To this day, a person's zip code remains one of the most significant predictors of health and well-being.

2

The California Air Resources Board ("CARB") developed critical health-preserving regulations to address this crisis, including the four rules at the heart of this case: the zero-emission Advanced Clean Trucks rule ("Clean Trucks rule"), the Zero-Emission Airport Shuttle Bus ("ZE Shuttle Bus") rule, the Zero-Emission Powertrain Certification ("ZE Powertrain Certification") regulation, and the Heavy-duty Emission Warranty ("Emission Warranty") amendments. CARB requested waivers of preemption for these rules pursuant to Section 209(b) of the Clean Air Act, which EPA granted on April 6, 2023. Petitioners now seek to invalidate EPA's Waiver Decisions.

Environmental Justice Intervenors East Yard Communities for Environmental Justice ("East Yard Communities") and People's Collective for Environmental Justice ("People's Collective") are incorporated associations and non-profit corporations with a history of advocating for the health and environment of communities in Southern California. Because pollution associated with the heavy-duty trucking sector is harmful to human health and the natural environment, Environmental Justice Intervenors strongly supported the adoption of these clean air rules, particularly the Clean Trucks rule.

Environmental Justice Intervenors seek to intervene in this action to protect their significant interests in ensuring these heavy-duty truck rules may be adopted and enforced. Environmental Justice Intervenors have a direct and immediate

interest in the outcome of this litigation, as many of their members reside in areas of Southern California most impacted by heavy-duty diesel trucks and breathe some of the dirtiest air in the nation.

Environmental Justice Intervenors respectfully request that this Court grant this motion to intervene as of right, or in the alternative, permissively, in all consolidated cases.

## BACKGROUND

### A. States and the Federal Government Must Work in Partnership to Reduce Air Pollution Under the Clean Air Act.

Congress purposefully designed the Clean Air Act to require states and the federal government to work as "partners in the struggle against air pollution." *General Motors Corp. v. United States*, 496 U.S. 530, 532 (1990). While the Clean Air Act generally prohibits states from "adopt[ing] or attempt[ing] to enforce any standard relating to the control of emissions from new motor vehicles," 42 U.S.C. § 7543(a), Congress created an important exception for California. The Clean Air Act gives California explicit authority to adopt and enforce emission standards that go above and beyond federal levels, so long as the state receives a waiver of preemption from EPA. *Id.* § 7543(b). Other states may adopt identical emission standards to California once waived by EPA. *Id.* § 7507.

Congress recognized the need for California to protect the health and well-being of its residents, to meet its federal air quality obligations, and to push the

vehicle industry to innovate cleaner technology. Indeed, "unique local conditions virtually demand that California retain strict and hopefully total control over all efforts to reduce emissions within her boundaries." H.R. Rep. No. 90-728, at 1986 (1967).

There are only three very narrow circumstances in which EPA is authorized to deny California's request for a waiver of preemption, as specified in the Clean Air Act: (1) California's protectiveness determination that its standards will be, in the aggregate, at least as protective of public health and welfare as applicable federal standards, is arbitrary and capricious, (2) California does not need separate state standards to meet compelling and extraordinary conditions, or (3) the state's standards and accompanying enforcement procedures are not consistent with Section 202(a) of the Clean Air Act. 42 U.S.C. § 7543(b). Importantly, "[i]f EPA concludes that California's standards pass this test, it is obligated to approve California's waiver application." *Motor & Equip. Mfrs. Ass'n v. EPA (MEMA II)*, 142 F.3d 449, 462-63 (D.C. Cir. 1998).

The burden of proof lies with those groups opposing California's waiver requests. *Motor & Equip. Mfrs. Ass'n v. EPA (MEMA I)*, 627 F.2d 1095, 1121 (D.C. Cir. 1979).

### B. EPA Granted California's Waiver of Preemption Requests for its Zero-Emission Heavy-duty Truck Regulations.

In two letters dated October 22, 2021 and December 20, 2021, CARB requested that EPA grant waivers of preemption, pursuant to Section 209(b) of the Clean Air Act, for all four heavy-duty vehicle regulations: the Clean Trucks rule, the Zero-Emission Shuttle Bus rule, the ZE Powertrain Certification rules, and the Emission Warranty amendments.[1] *See* 87 Fed. Reg. 35768, 35769 (June 13, 2022).

The Clean Trucks rule requires manufacturers to sell an increasing percentage of zero-emission or plug-in hybrid electric vehicles according to vehicle class, from 2024 to 2035. 88 Fed. Reg. at 20689. As of this filing, nine states have adopted the Clean Trucks rule pursuant to 42 U.S.C. § 7507, including Colorado, Massachusetts, Maryland, New Jersey, New York, Oregon, Rhode Island, Vermont, and Washington.[2] Several other states have signed a memorandum of understanding committing to adopt the Clean Trucks rule, including Connecticut, Maine, North Carolina, Pennsylvania, and Virginia.

---

[1] California requested that EPA confirm the Emission Warranty amendments fall within the scope of a 2005 waiver of preemption granted for emission standards and associated test procedures for heavy-duty diesel vehicles and engines with MY 2007 and beyond, 70 Fed. Reg. 50322 (Aug. 26, 2005), or in the alternative, that EPA grant a new waiver for the amendments. *See* 87 Fed. Reg. 35760, 35761 (June 13, 2022).

[2] *See* 5 Colo. Code Regs. § 1001-24:F; 310 Mass. Code Regs. 7.40; Md. Code Ann., Env't § 2-1103.1; N.J. Admin. Code §§ 7.27-31 & 33; N.Y. Comp. Codes R.& Regs. tit. 6, §§ 218-1.1, 218-2.1, 218-4.1, 218-4.2; Or. Admin. R. 340-2570050(3); Vt. Code R. 12-030-040; Wash. Admin. Code §§ 173-423-010 *et seq.*

The ZE Shuttle Bus rule sets increasingly stringent zero-emission fleet composition requirements for airport shuttle fleet owners, leading to full electrification of airport shuttles serving the 13 largest airports in California by the end of 2035. 88 Fed. Reg. at 20689. The ZE Powertrain Certification rule establishes certification procedures and requirements for medium- and heavy-duty battery-electric and hydrogen fuel cell powertrains for Model Year (MY) 2021 and beyond. *Id.* Finally, the Emission Warranty amendments lengthen the emissions warranty period for certain heavy-duty diesel engines for MY 2022 and beyond and require vehicle owners to perform scheduled maintenance on emission-related components for heavy-duty diesel vehicles. *Id.* at 20688.

EPA held a virtual public hearing on CARB's waiver requests on June 29 and June 30, 2022, *id.* at 20690, and solicited comments by August 2, 2022. 87 Fed. Reg. 35768, 35769. The vast majority of commenters, including environmental and public health organizations, states, local Air Districts and other agencies, members of Congress, and some auto manufacturers, supported granting the waiver requests.[3] Environmental Justice Intervenors submitted comments as

---

[3] *See, e.g.*, Environmental and Public Health Organizations, Docket Nos. EPA–HQ–OAR–2022–0330–0066, EPA–HQ–OAR–2022–0331–0099; Health and Medical Organizations, Docket No. EPA–HQ–OAR–2022–0331–0057; Coalition of 16 states, the District of Columbia, and the City of New York, EPA–HQ–OAR–2022–0331–0092; Northeast States for Coordinated Use Management, EPA–HQ–OAR–2022–0330–0017, EPA–HQ–OAR–2022–0330–0053, EPA–HQ–OAR–

7

members of the Moving Forward Network urging EPA to grant California's waiver requests.[4] On April 6, 2023, EPA published a notice in the *Federal Register* of its final actions granting the waiver requests for all four rules. 88 Fed. Reg. 20688 (Apr. 6, 2023).

On June 5, 2023, Petitioners filed six challenges to EPA's waiver decisions for these four rules: Western States Trucking Association, Inc. et al. (Case No. 23-1143); Iowa and other states (Case No. 23-144); Illinois Soybean Association et al. (Case No. 23-1145); American Fuel & Petrochemical Manufacturers et al. (Case No. 23-1146); The 200 For Homeownership et al. (Case No. 23-1147); and Owner-Operator Independent Drivers Association, Inc. (Case No. 23-1148) (collectively "Petitioners"). Petitioners seek to vacate EPA's waiver decisions. If successful, California and other states would be impeded in their abilities to clean up pollution from trucks and shuttle buses.

---

2022–0330–0074, EPA–HQ–OAR–2022–0330–0104, EPA–HQ–OAR–2022–0330–0135; National Association of Clean Air Agencies, EPA–HQ–OAR–2022–0330–0035, EPA–HQ–OAR–2022–0330–0019, EPA–HQ–OAR–2022–0330–0067, EPA–HQ–OAR–2022–0330–0029; Senator Padilla et al., Docket Nos. EPA–HQ–OAR–2022–0330–0035, EPA–HQ–OAR–2022–0331–0038; Auto manufacturers, Docket Nos. EPA–HQ–OAR–2022–0330–0038, EPA–HQ–OAR–2022–0331–0060, EPA–HQ–OAR–2022–0331–0066.

[4] *See* EPA–HQ–OAR–2022–0331–0077 (Clean Trucks rule, ZE Shuttle Bus, ZE Powertrain rules); EPA–HQ–OAR–2022–0330–0051 (Emission Warranty Amendments).

## STANDARDS FOR INTERVENTION

Pursuant to Federal Rule of Appellate Procedure 15(d), a motion to intervene in defense of an agency action "must contain a concise statement of the interest of the moving party and the grounds for intervention." While that rule does not specify any standard for intervention, this Court may look to Federal Rule of Civil Procedure 24 for guidance, *cf. Mass. Sch. of Law at Andover, Inc. v. United States*, 118 F.3d 776, 779 (D.C. Cir. 1997), because the "policies underlying intervention" in district courts "may be applicable in appellate courts," *Int'l Union v. Scofield*, 382 U.S. 205, 217 n.10 (1965).

Intervention as of right under Federal Rule of Civil Procedure 24(a)(2) depends on the following four factors:

> (1) the timeliness of the motion; (2) whether the applicant "claims an interest relating to the property or transaction which is the subject of the action"; (3) whether "the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest"; and (4) whether "the applicant's interest is adequately represented by existing parties."

*Fund For Animals, Inc. v. Norton*, 322 F.3d 728, 731 (D.C. Cir. 2003) (quoting *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1074 (D.C. Cir. 1998).

Movant-intervenors seeking to defend agency actions against petitions for review must also show Article III standing. *See Nat. Res. Def. Council v. EPA*, 896 F.3d 459, 462-63 (D.C. Cir. 2018). To do so, intervenors must establish injury in fact, causation, and redressability. *Deutsche Bank Nat'l Trust Co. v. FDIC*, 717

F.3d 189, 193 (D.C. Cir. 2013). Standing is regularly shown "where a party benefits from agency action, the action is then challenged in court, and an unfavorable decision would remove the party's benefit." *Crossroads Grassroots Pol'y Strategies v. FEC*, 788 F.3d 312, 317 (D.C. Cir. 2015). An organization has associational standing in which it may defend agency action on its members' behalf when: "(1) at least one of its members would have standing to [defend] in his or her own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the [defense] asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hearth, Patio & Barbecue Ass'n v. EPA*, 11 F.4th 791, 802 (D.C. Cir. 2021) (cleaned up).

Additionally, under Rule 24(b)(1)(B), courts have discretion to grant permissive intervention to applicants that, through a timely motion, assert a claim or defense that shares a common question of law or fact with the principal action. *E.E.O.C. v. Nat'l Children's Ctr., Inc.*, 146 F.3d 1042, 1046 (D.C. Cir. 1998). In exercising its discretion, a court must consider "whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." *Defs. of Wildlife v. Perciasepe*, 714 F.3d 1317, 1327 (D.C. Cir. 2013) (citing Fed. R. Civ. P. 24(b)(3)).

## STATEMENT OF INTEREST AND STANDING

Environmental Justice Intervenors have a long history of working to improve air quality in California, including by advocating for reducing harmful pollution from the transportation and freight industries. Environmental Justice Intervenors have protectable interests in shielding their members from harms that would result if EPA's Waiver Decisions were vacated.

Environmental Justice Intervenors have standing to intervene. East Yard Communities and People's Collective members live and work near routes and sites that experience a significant number of heavy-duty trucks and shuttles. The resulting air pollution directly causes physical, financial, and mental harm to East Yard Communities and People's Collective members that would be significantly reduced by California's emission standards. With a favorable decision from the court, East Yard Communities and People's Collective members would retain the benefit of EPA's Waiver Decisions and avoid additional injury from truck and shuttle pollution. *Crossroads,* 788 F.3d at 317 (establishing that standing is shown where a party's benefit from agency action would be removed by an unfavorable decision).

If this Court were to vacate the Waiver Decisions, members of Environmental Justice Intervenors would suffer from increased exposure to air pollution from emissions-producing heavy-duty vehicles. East Yard Communities

and People's Collective members live near major freight corridors, warehouses, ports, bus depots, and airports that contribute to a high volume of polluting trucks and airport shuttles in their communities. Thomas Decl. ¶¶ 11-20; Vidaurre Decl. ¶¶ 19-23. Exhaust from these diesel-powered trucks and shuttles results in a recurring layer of soot that members must regularly clean off their homes and windows. Thomas Decl. ¶ 23; Vidaurre Decl. ¶ 29. The areas where East Yard Communities and People's Collective members live will continue to be freight and transportation hubs where the continuation of combustion trucks and airport shuttles would exacerbate the physical, financial, and mental toll of air pollution. Thomas Decl. ¶¶ 38-41; Vidaurre Decl. ¶¶ 39-41.

Environmental Justice Intervenors' members report high rates of asthma, allergies, lung cancer, and skin issues linked to the poor air quality in their communities. Thomas Decl. ¶¶ 24-28, 30-31; Vidaurre Decl. ¶¶ 25-26, 31-33, 35. These ailments afflict young and old alike, with children younger than one developing allergies and older members frequently dying prematurely. Thomas Decl. ¶¶ 35-36; Vidaurre Decl. ¶ 26. Continued air pollution from heavy-duty vehicles would result in a worsening of members' health conditions and additional members experiencing chronic illness and shortened lifespans. Thomas Decl. ¶¶ 40-41; Vidaurre Decl. ¶ 39.

The impacts of air pollution also cause financial strain on Environmental Justice Intervenors' members. Members make financial sacrifices for loved ones who are ill due to the inhalation of emissions, frequently spending time and money to care for them. Thomas Decl. ¶¶ 30-32, 38; Vidaurre Decl. ¶¶ 35, 41. Members themselves often struggle with having to take time off from school or work due to air pollution-related illness while managing the high costs of medical care. Thomas Decl. ¶¶ 30-31, 35; Vidaurre Decl. ¶ 35. Personal and familial healthcare needs would increase if the Waiver Decisions were vacated. Thomas Decl. ¶¶ 39-40; Vidaurre Decl. ¶ 41.

The physical and financial burdens of air pollution on members leads to mental and emotional distress from seeing themselves and others suffering. Environmental Justice Intervenors' members worry constantly about the negative impacts of air pollution and often feel powerless in the face of seeing family and community members suffer. Thomas Decl. ¶¶ 30-33, 38; Vidaurre Decl. ¶¶ 27, 37. Diesel-powered trucks also result in constant noise and foul odors that hinder members' ability to rest or enjoy outdoor spaces, further impacting their mental health. Thomas Decl. ¶¶ 21-22; Vidaurre Decl. ¶ 28. The stress from the continued use of emissions-producing trucks and shuttles would severely reduce the quality of life in these communities and further entrench the cycle of generational harm and devastation. Thomas Decl. ¶¶ 38-40; Vidaurre Decl. ¶ 41.

Because members have standing, Environmental Justice Intervenors also satisfy associational standing. Improving air quality and protecting the rights of members is foundational to the purpose of both East Yard Communities and People's Collective, and upholding EPA's Waiver Decisions does not require the participation of any individual member. *Hearth, Patio & Barbecue,* 11 F.4th at 802 (explaining that organizations satisfy associational standing when individual members have standing and whose interests are "germane" to the organization's purpose).

East Yard Communities, founded in 2001, is an environmental health and justice non-profit corporation working towards a safe and healthy environment for communities that are disproportionately suffering the negative impacts of industrial pollution. East Yard Communities represents approximately 1,000 members in East Los Angeles, Southeast Los Angeles, Long Beach, Carson, and Wilmington. Thomas Decl. ¶ 6. Through grassroots organizing and leadership building skills, East Yard Communities prepares community members to engage in policy issues of environmental justice and air quality at the regional, statewide, and national level. For decades, East Yard Communities has advocated for health-preserving regulations at CARB. *Id.* ¶¶ 5, 7-8. Because the heavy-duty truck rules will reduce pollution in areas where its members reside, East Yard Communities seeks to

defend EPA's waiver decisions to protect the health and safety of its members. *Id.* ¶¶ 8, 39.

People's Collective is an incorporated nonprofit association dedicated to building community power in the Inland Empire to fight against pollution and environmental racism. Founded in 2020, People's Collective represents over 1,000 community members in the Inland Empire who are impacted by the freight and logistics industry. Vidaurre Decl. ¶¶ 4, 6. Since its inception, People's Collective has advocated for strong regulations to reduce pollution from the freight and logistics industry. *Id.* ¶ 7. The heavy-duty truck rules are essential to reducing the pollution burdens of People's Collective members. *Id.* ¶¶ 38-39.

## GROUNDS FOR INTERVENTION

For the reasons detailed below, this Court should permit Environmental Justice Intervenors to intervene in all petitions for review of the Waiver Decisions. Environmental Justice Intervenors satisfy the grounds for intervention as required by Fed. R. App. P. 15(d) and further specified in Fed. R. Civ. P. 24(a)(2).

First, Environmental Justice Intervenors timely filed this motion to intervene within 30 days of the petitions for review filed on June 5, 2023. *See* Fed. R. Civ. P. 24(a)(2); Fed. R. App. P. 15(d).

Second, as previously noted, Environmental Justice Intervenors have demonstrated significantly protectable interests in EPA's Waiver Decisions. *See*

Fed. R. Civ. P. 24(a)(2). East Yard Communities and People's Collective members live and work near some of the most heavily-trafficked truck routes in California, and suffer from numerous health issues related to the poor air quality resulting from diesel truck emissions. Thomas Decl. ¶¶ 11-20, 34; Vidaurre Decl. ¶¶ 20-26. Community members who work at warehouses unloading diesel trucks bring soot-covered clothing home to their families, further spreading the impacts of this dangerous pollutant. Vidaurre Decl. ¶ 34. Members must limit time outdoors during smog-heavy months in order to protect their health and the health of their loved ones. Thomas Decl. ¶ 24; Vidaurre Decl. ¶¶ 30, 36; *Nat. Res. Def. Council v. EPA*, 755 F.3d 1010, 1016-17 (D.C. Cir. 2014) (environmental movants have standing where members are concerned about the effects of pollution on their health and, in some cases, spend less time outdoors for this reason); *Ass'n of Battery Recyclers v. EPA*, 716 F.3d 667, 672 (D.C. Cir. 2013) (finding associational standing where members live or work in close proximity to source and reduced their time outdoors because of this pollution).

Moreover, both organizations have invested significant time and effort into developing a strong Clean Trucks rule that can protect the health of members and their loved ones. Thomas Decl. ¶¶ 8-10; Vidaurre Decl. ¶¶ 12-18; *see Nat'l Lime Ass'n v. EPA*, 233 F.3d 625, 636 (D.C. Cir. 2000) (illustrating associational

standing as "undemanding," such that "mere pertinence between litigation subject and organizational purpose is sufficient.").

Third, the disposition of this case would likely impair Environmental Justice Intervenors' ability to protect their interests. *See* Fed. R. Civ. P. 24(a)(2). If EPA's Waiver Decisions are vacated, Environmental Justice Intervenors will experience greater air pollution from heavy-duty trucks and shuttles. Given community members' proximity to heavily-trafficked roadways, railyards, ports, bus depots, and airports, increased emissions will likely put members at increased risk of developing new or worsened health conditions, which would put an additional financial burden on members to expend resources and time to care for themselves and loved ones.

Additionally, as organizations, if the Waiver Decisions are vacated, Environmental Justice Intervenors will not have the benefits of these zero-emission rules and will therefore face additional challenges in fulfilling their missions to reduce air pollution from the freight and logistics industry in Southern California.

Finally, Environmental Justice Intervenors' interests are not adequately represented by the existing parties. *See* Fed. R. Civ. P. 24(a)(2). This requirement is a "minimal" one, *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972), and satisfying it is "not onerous." *Dimond v. District of Columbia*, 792 F.2d 179, 192 (D.C. Cir. 1986). While Respondents, proposed State-

Intervenors, and proposed environmental non-governmental organization intervenors all share an interest with Environmental Justice Intervenors in defending EPA's Waiver Decisions, the interests of environmental justice groups cannot be adequately represented by Respondents or other proposed intervenors.

Respondents have an interest in protecting the American public and the environment and climate from degradation, but they also represent the interests of the fossil fuel industry, truck and bus manufacturers, and the trucking industry. Proposed State-Intervenors have an interest in reducing pollution in their states, and in creating a welcoming environment for trucking, logistics, manufacturing, and other industries in their state. Proposed environmental non-governmental organization intervenors have an interest in eliminating air and climate pollution in California and across the country.

Environmental Justice Intervenors share some of these concerns—like protecting the American public and avoiding air and climate pollution—but also represent more specific interests. For example, Environmental Justice Intervenors represent an interest in addressing the impacts from the trucking industry on frontline community members who live and work near trucking corridors, roadways, airport, and bus depots and are consistently exposed to significantly higher air pollution and health concerns than those who does not live near heavy concentrations of large trucks. Environmental Justice Intervenors also represent the

interests of a population that has experienced family members develop numerous health conditions and die prematurely due to poor air quality resulting from concentrating the siting of facilities with trucks and airport shuttles. Moreover, as members of the Moving Forward Network, which is a national network of 50+ organizations that center grassroots, frontline knowledge, expertise, and engagement with communities across the United States that bear negative impacts of the global freight transportation system, Environmental Justice Intervenors represent the more specific interests of avoiding frontline air pollution in communities across the country. *Nat. Res. Def. Council v. Costle*, 561 F.2d 904, 913 (D.C. Cir. 1977) (satisfying burden where "overall point of view might be shared," but specific interests in the disposition may not be adequately represented by existing parties).

For these reasons, Environmental Justice Intervenors are entitled to intervene in this litigation as a matter of right.

Alternatively, this Court should grant Environmental Justice Intervenors permissive intervention because they satisfy the three-part test. Fed. R. Civ. P. 24(b)(1), (b)(3). First, as previously discussed, this motion is timely. Second, Environmental Justice Intervenors have a claim or defense that shares a common question of law or fact with the main action. Indeed, Environmental Justice Intervenors intend to defend against existing claims, which necessarily share

questions of law and fact with the underlying challenges, rather than bring new ones. Third, intervention will not unduly delay or prejudice existing parties as these cases are in the preliminary stages of litigation and no briefing schedule has been set.

## CONCLUSION

For all the foregoing reasons, Environmental Justice Intervenors have satisfied the requirements for intervention as a matter of right and, alternatively, as a matter of permissive intervention. *See* Fed. R. App. P. 15(d); Fed. R. Civ. P. 24(a)(2), (b)(1), (b)(3). Environmental Justice Intervenors therefore respectfully request that the Court grant this motion to intervene in support of Respondents in all cases involving EPA's Waiver Decisions.


Dated:  June 29, 2023                Respectfully submitted,

                                     */s/ Adriano L. Martinez*
                                     ADRIANO L. MARTINEZ (237152)
                                     YASMINE L. AGELIDIS (321967)
                                     amartinez@earthjustice.org
                                     yagelidis@earthjustice.org
                                     Earthjustice
                                     707 Wilshire Blvd., Suite 4300
                                     Los Angeles, CA 90017
                                     Tel: (415) 217-2000 / Fax: (415) 217-2040

                                     PAUL R. CORT (184336)
                                     pcort@earthjustice.org
                                     Earthjustice
                                     50 California Street, Suite 500

San Francisco, CA 94111
Tel: (415) 217-2000 / Fax: (415) 217-2040

*Counsel for Proposed Environmental Justice*
*Intervenors East Yard Communities for*
*Environmental Justice and People's*
*Collective for Environmental Justice*

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and Circuit Rule 26.1, Environmental

Justice Intervenors East Yard Communities and People's Collective provide the

following corporate disclosure statement:

East Yard Communities is a nonprofit corporation and People's Collective is

an incorporated nonprofit association focused on fighting for environmental justice

for communities disproportionately exposed to freight pollution. Movants do not

have any outstanding shares or debt securities in the hands of the public nor any

parent, subsidiary, or affiliates that have issued shares or debt securities to the

public.


Dated:  June 29, 2023                    Respectfully submitted,

                                         */s/ Adriano L. Martinez*
                                         ADRIANO L. MARTINEZ (237152)
                                         YASMINE L. AGELIDIS (321967)
                                         amartinez@earthjustice.org
                                         yagelidis@earthjustice.org
                                         Earthjustice
                                         707 Wilshire Blvd., Suite 4300
                                         Los Angeles, CA 90017
                                         Tel: (415) 217-2000 / Fax: (415) 217-2040

                                         PAUL R. CORT (184336)
                                         pcort@earthjustice.org
                                         Earthjustice
                                         50 California Street, Suite 500
                                         San Francisco, CA 94111
                                         Tel: (415) 217-2000 / Fax: (415) 217-2040

*Counsel for Proposed Environmental Justice Intervenors East Yard Communities for Environmental Justice and People's Collective for Environmental Justice*

## CERTIFICATE OF PARTIES

Pursuant to Circuit Rule 27(a)(4) and 28(a)(1)(A), I certify that the parties are set forth below:

**Petitioners**: Petitioners in Case No. 23-1143 are Western States Trucking Association, Inc. and Construction Industry Air Quality Coalition, Inc.

Petitioners in Case No. 23-1144 are State of Iowa, State of Alabama, State of Arkansas, State of Georgia, State of Indiana, State of Kansas, State of Kentucky, State of Louisiana, State of Mississippi, State of Missouri, State of Montana, State of Nebraska, State of North Dakota, State of Ohio, State of Oklahoma, State of South Carolina, State of Utah, State of West Virginia, and State of Wyoming.

Petitioners in Case No. 23-1145 are Illinois Soybean Association, Iowa Soybean Association, Minnesota Soybean Growers Association, North Dakota Soybean Growers Association, Ohio Soybean Association, South Dakota Soybean Association, Clean Fuels Development Coalition, ICM, Inc., and Diamond Alternative Energy, LLC.

Petitioners in Case No. 23-1146 are American Fuel & Petrochemical Manufacturers, Agricultural Retailers Association, American Petroleum Institute, American Royalty Council, California Asphalt Pavement Association, California Manufacturers & Technology Association, Consumer Energy Alliance, Domestic Energy Producers Alliance, Energy Marketers of America, Louisiana Mid-

Continent Oil & Gas Association, National Association of Convenience Stores, Nevada Petroleum Marketers & Convenience Store Association, The Petroleum Alliance of Oklahoma, Texas Association of Manufacturers, Texas Oil & Gas Association, Texas Royalty Council, and Western States Petroleum Association.

Petitioners in Case No. 23-1147 are The 200 for Homeownership, The 60 Plus Association, Orange County Water District, and Mesa Water District.

Petitioner in Case No. 23-1148 is Owner-Operator Independent Drivers Association, Inc.

**Respondents**: Respondents are the U.S. Environmental Protection Agency and Michael S. Regan, in his official capacity as Administrator of the EPA.

**Intervenors**: Proposed State-Intervenors in Case No. 23-1143 and all consolidated cases are the State of California, the State of Colorado, the State of Connecticut, the State of Delaware, the State of Hawaii, the State of Illinois, the State of Maine, the State of Maryland, the State of Minnesota, the State of New Jersey, the State of New York, the State of North Carolina, the State of Oregon, the State of Rhode Island, the State of Vermont and the State of Washington; the

Commonwealths of Massachusetts and Pennsylvania; the District of Columbia; and the Cities of Los Angeles and New York.

**Amici Curiae**: There are no amici curiae at the time of this filing.

DATED: June 29, 2023                    */s/ Adriano L. Martinez*
                                        Adriano L. Martinez

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing **MOTION OF ENVIRONMENTAL JUSTICE ORGANIZATIONS TO INTERVENE IN SUPPORT OF RESPONDENTS** contains 4,235 words and was composed in Times New Roman font, 14-point. The motion complies with all applicable type-volume and typeface requirements.

DATED: June 29, 2023

*/s/ Adriano L. Martinez*
Adriano L. Martinez

## CERTIFICATE OF SERVICE

I hereby certify that on June 29th, 2023, I have served the foregoing

**MOTION OF ENVIRONMENTAL JUSTICE ORGANIZATIONS TO**

**INTERVENE IN SUPPORT OF RESPONDENTS** and attachments on all

parties through the Court's electronic case filing (ECF) system.

*/s/ Adriano L. Martinez*
Adriano L. Martinez

# Exhibit 1 – Declaration of Taylor Thomas

## DECLARATION OF TAYLOR THOMAS

I, Taylor Thomas, hereby declare and state as follows:

1.     This declaration is based on my personal knowledge. If called to testify as a witness, I could and would testify competently to the contents hereof.

2.     I am over the age of eighteen (18) and suffer no legal incapacity.

3.     I am 33 years old.

4.     I am employed by East Yard Communities for Environmental Justice ("EYCEJ") and have been for approximately 8 years. Since August 2020, I have served as Co-Executive Director. From 2015 through 2020, I served as a Research and Policy Analyst for EYCEJ.

5.     EYCEJ is an environmental health and justice non-profit corporation focused on reducing industrial pollution that disproportionately impacts working class communities of color. The organization was formed in 2001 by residents of Commerce and East Los Angeles impacted by the expanding goods movement and rail industry.

6.     EYCEJ has approximately 1,000 members who reside in East Los Angeles, Southeast Los Angeles, Long Beach, Carson, and Wilmington.

7.     EYCEJ engages decisionmakers at local, state, and national governmental agencies and elected offices to advocate for issues such as truck traffic, freeway pollution, and railyard developments.

1

8.    This engagement included EYCEJ members fighting hard for the Advanced Clean Trucks ("ACT") and other zero-emissions rules. I and other EYCEJ members attended meetings at the California Air Resources Board ("CARB") and provided testimony in support of California's zero-emissions rules, including the ACT rule.

9.    In addition, EYCEJ is a member of the Moving Forward Network ("MFN"), which is a national network of 50+ organizations that center grassroots, frontline knowledge, expertise, and engagement with communities across the United States that bear negative impacts of the global freight transportation system.

10.    As a member of MFN, EYCEJ joined other organizations in submitting a comment letter on August 2, 2022 in support of EPA granting California's waiver request for the ACT Rule, Zero-Emission Airport Shuttle Rule, and Zero-Emission Powertrain Certification Rule, Docket No. EPA-HQ-OAR-2022-0331, as well as California's waiver request for the Heavy-Duty Emissions Warranty Amendment, Docket No. EPA-HQ-OAR-2022-0330.

11.    I live in Long Beach in Southern California.

12.    I have lived in Long Beach my whole life.

13.    Interstate 710 and the Anaheim Corridor are major freight corridors that traverse my community.

2

14.     The Ports of Los Angeles and Long Beach ("POLA/POLB") are also major freight hubs located just south of Long Beach. POLA/POLB experience some of the highest levels of air pollution in the Southern California region.

15.     There are at least two square miles of refrigerated warehouses north of my neighborhood. I estimate that 10,000-15,000 people could live in the area that these warehouses occupy.

16.     There are numerous bus depots and transit bus routes that traverse my neighborhood, including Long Beach Transit, Los Angeles Department of Transportation Transit, Los Angeles Metropolitan Transportation Authority, Orange County Transportation Authority, and Torrance Transit.

17.     Members of EYCEJ also live and work close to the Long Beach Airport and Los Angeles International Airport and experience pollution from airport shuttles traveling to and from these airports.

18.     I personally see about 300 trucks per day travel through my neighborhood in Long Beach.

19.     I also see around four airport shuttles per day drive through my community in Long Beach.

20.     According to regional data, it is my understanding that about 10 years ago a truck count performed on the Interstate 710 corridor counted between

3

40,000-60,000 truck trips on the Interstate 710 per day. Today, this number is likely higher due to increased throughput at the POLA/POLB.

21.    EYCEJ members report a visceral negative reaction to the constant movement of trucks in their neighborhoods. The noise from trucks disrupts our peace and leaves us with lingering stress well after the truck has passed.

22.    Additionally, the acrid, chemical odor of diesel fumes is ever-present.

23.    EYCEJ members and I must regularly clean our windows and homes from the soot left by diesel exhaust.

24.    I spend at least one hour a day outdoors walking or biking. However, I find it difficult to be outdoors for prolonged periods of time because of the poor air quality on the majority of days, especially in the summer.

25.    I developed acute health problems due to air pollution. I was diagnosed with controlled asthma when I was 7 years old.

26.    I also suffer from chronic bronchitis and pneumonia, which I was diagnosed with at age 7. These conditions continued to be triggered about once per year until I started regularly masking outdoors. When triggered, all three conditions cause constricted breathing and wheezing.

27.    As a child, I also experienced chronic migraines which I believe were connected to pollution in my community.

4

28.     I notice that my respiratory issues are worsened by poor air quality. On bad air days, I experience eye irritation, headaches, congestion, coughing, and wheezing. These symptoms improve when the air quality is better.

29.     I try to always wear a mask outdoors to avoid the soot and odor.

30.     Members of my family and community are also negatively impacted by poor air quality, which causes me significant mental distress.

31.     My mother, sister, and niece experience multiple respiratory issues, including asthma. My sister cannot afford the medication she needs, and her health has suffered as a result. I often take off work to care for my sick family members. I help transport them to the doctor and I assist them with the costs of medication.

32.     The medication and treatment my family members need for their air pollution-induced health issues have been a financial burden on my family since we moved to Long Beach in the 1970s.

33.     I wake up and go to sleep every day thinking about how poor air quality negatively impacts my family and community. It is easy to feel helpless in the face of so much pollution, but more than anything I feel angry that people who can't fend for themselves are subjected to such horrible conditions. It motivates me to fight to protect my family and community, but also adds a lot of stress that otherwise would be absent.

34.    EYCEJ members experience a much higher rate of diagnosed asthma, chronic obstructive pulmonary disease, and lung cancer related to poor air quality.

35.    EYCEJ members frequently miss work or school due to pollution-induced asthma, occupational allergies, nosebleeds, and headaches.

36.    Children less than one year old frequently develop allergies due to the high levels of air pollution around their homes.

37.    It is unfortunately not uncommon for community members to die prematurely because of the elevated levels of poor air quality in the region.

38.    Pollution from heavy-duty vehicles also negatively impacts the financial, mental, and emotional health of EYCEJ members. EYCEJ members are constantly faced with the reality that they cannot escape the pollution that is making them and their loved ones sick. This severely impacts their quality of life as they cope with the stresses associated with sickness from air pollution.

39.    California's zero-emissions policies for trucks and airport shuttles will provide a benefit to me and my community by dramatically reducing air pollution. This will change the health and quality of life outcomes for future generations, stopping the cycle of harm and devastation.

40.    If EPA's waiver decisions are reversed, my own health will deteriorate, and I will have to spend more time than I already do caregiving for my

sick family members. It upsets me to think that the suffering of my family and community could continue when mitigation of their harm is readily available.

41.    Without these policies, millions of people will continue to be poisoned by poor air quality and suffer from chronic illness and shortened life spans. The quality of life will continue to fall for a community that has already experienced marginalization and discrimination.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 28th day of June, 2023.

_____

Taylor Thomas

# Exhibit 2 – Declaration of Andrea Vidaurre

## DECLARATION OF ANDREA VIDAURRE

I, Andrea Vidaurre, hereby declare and state as follows:

1.      This declaration is based on my personal knowledge. If called to testify as a witness, I could and would testify competently to the contents hereof.

2.      I am over the age of eighteen (18) and suffer no legal incapacity.

3.      I am 28 years old.

4.      I am a co-founder and Policy Lead for People's Collective for Environmental Justice ("PCEJ"), an incorporated association based in Grand Terrace, California. I have worked in this position since PCEJ was founded in August 2020. I am also a member of PCEJ and have been since August 2020.

5.      PCEJ aims to fight against pollution and environmental racism through community power. PCEJ works to build political influence for the health, wellbeing, and self-reliance of the Inland Empire.

6.      PCEJ has engaged over 1,000 community members in San Bernardino, Bloomington, Jurupa Valley, and other areas of the Inland Empire that are impacted by air pollution caused by the freight and logistics industry.

7.      Since its inception, PCEJ has worked on air quality and air pollution issues locally, regionally, statewide, and nationally. Specifically, PCEJ engages in rulemaking and legislative processes that affect our members as residents of the Inland Empire and California who are impacted by air pollution.

1

8.    PCEJ works to educate members on policy issues that impact their daily lives. PCEJ also works alongside its members to devise community-centered solutions that will better their communities.

9.    PCEJ engages with local, state, and national governmental agencies and elected officials to advocate for these solutions. PCEJ and its members participate in this effort to influence decision makers by canvassing and phone banking in the community.

10.    I have worked on environmental justice issues for the past 7 years, including issues of air quality and vehicle emissions. As Policy Lead at PCEJ, I track and analyze local, regional, state, and federal policies related to air quality. I provide policy recommendations to ensure that these policies better fit the lived experiences of communities in the Inland Empire.

11.    I frequently discuss with PCEJ members the short- and long-term health impacts they experience from air pollution.

12.    PCEJ members have fought hard for the Advanced Clean Trucks ("ACT") and other zero-emissions rules, even taking off work to protect their community.

13.    Many PCEJ members attended meetings at the California Air Resource Board ("CARB") and provided testimony in support of California's zero-emissions rules, including the ACT rule.

2

14.    I also attended many meetings at CARB and provided public comment in support of strong zero-emissions rules, including the ACT rule.

15.    I and other PCEJ staff also conducted research on how to mitigate heavy-duty vehicle pollution impacts.

16.    In addition, PCEJ is a member of the Moving Forward Network ("MFN"), which is a national network of 50+ organizations that center grassroots, frontline knowledge, expertise, and engagement with communities across the United States that bear negative impacts of the global freight transportation system.

17.    As a member of MFN, PCEJ submitted a comment letter on August 2, 2022 in support of EPA granting California's waiver request for the ACT Rule, Zero-Emission Airport Shuttle Rule, and Zero-Emission Powertrain Certification Rule, Docket No. EPA-HQ-OAR-2022-0331.

18.    PCEJ also submitted a comment letter on August 2, 2022 through MFN in support of EPA granting California's waiver request for the Heavy-Duty Emissions Warranty Amendments, Docket No. EPA-HQ-OAR-2022-0330.

19.    I live in Rancho Cucamonga in the Inland Empire in Southern California.

20.    I have lived in California my whole life and have lived in the Inland Empire for the past 15 years.

21.    Interstates 15 and 210 are the major freight corridors that run through my city. Interstate 10 runs just to the south of city limits.

22.    Ontario International Airport, which is also a freight hub, is just south of Rancho Cucamonga and a major source of truck and shuttle traffic through my community.

23.    I witness around 300 trucks and a dozen airport shuttles in Rancho Cucamonga per day.

24.    Air quality in the Inland Empire consistently reaches unsafe levels according to the federal air quality standards. For example, the South Coast Air Basin experienced over 100 bad air days in each of the last several years.

25.    PCEJ members experience higher rates of asthma, occupational allergies, nosebleeds, headaches, and polycystic ovary syndrome, which doctors have linked to the poor air quality.

26.    It is common for children under the age of one to develop allergies because of the air pollution levels around their homes. PCEJ members have also had family members die prematurely because of the environment they live in and the cumulative impacts of truck emissions.

27.    Pollution from heavy-duty vehicle emissions also negatively impacts the mental health of PCEJ members. PCEJ members are frontline to trucking

4

pollution and bear the emotional toll of knowing that their homes – where they wish to retire or raise children – are in an industrial zone rife with health risks.

28.    The concentration of trucks and shuttles in my community also results in constant noise and vibration that prevents the peaceful use and enjoyment of outdoor spaces. PCEJ members who are closer to highways are unable to rest peacefully due to the inescapable noise.

29.    Diesel exhaust from these vehicles also causes a film of soot to coat the windows of cars and homes. PCEJ members have to regularly clean their windows and homes, especially in the summer.

30.    I spend around five hours a day outdoors, walking and working. However, like many PCEJ members, I frequently find it difficult to be outdoors for prolonged periods of time because of the poor air quality.

31.    I have experienced acute health impacts from air pollution. As a child, I had asthma that made it difficult to breathe. Now, I have adult allergies that similarly restrict my breathing. I was also diagnosed with eczema three years ago, which causes itchiness and general discomfort when triggered.

32.    I notice that my respiratory and skin issues are worsened by poor air quality. On bad air days, I experience difficulty breathing, itchiness, and rashes. These symptoms improve when the air quality is better.

5

33.    Members of my family and community are negatively impacted by poor air quality, which causes me significant mental distress.

34.    Members of my family work at nearby airport freight hubs and warehouses. They are regularly exposed to diesel pollution from this work and come home covered in diesel exhaust.

35.    My nieces and nephews were born with industrial allergies and developed asthma at a young age. I am careful where I take them to avoid exposure to air pollution. I also frequently assist them with schoolwork when they miss school due to their asthma. My nephew is now homeschooled because of the number of school days he has missed due to poor air quality.

36.    Unsafe air quality also prevents PCEJ from performing community engagement. During the spring and winter months when air quality is typically better, PCEJ usually does door to door canvassing two to four times a month. However, outdoor canvassing is shut down for three months in the summer due to poor air quality.

37.    I feel powerless when seeing family and community members suffer from air pollution. I may be able to improve the air quality indoors but cannot control the air quality outdoors. This causes me to worry all the time, whether smog is visible or not.

38.    California's zero-emissions policies for trucks and airport shuttles will provide a benefit to me and my community by providing cleaner air, healthier communities, and reducing noise.

39.    Without these policies, PCEJ members and I would continue to be disproportionately affected by chronic illness and shortened lifespans that accompany air pollution.

40.    The Inland Empire continues to be a logistics hub and the air quality will continue to worsen as more trucks come to the area that are not zero-emissions.

41.    I will be personally impacted by having to spend more time avoiding air pollution, spending money to take care of myself and sick family members, and dealing with the added stress of a decreasing quality of life.

42.    California's authority to adopt vehicle emission standards under the CAA provides an important avenue for advocacy by PCEJ, empowering me and my community to fight for better air quality in the Inland Empire.


I declare under penalty of perjury that the foregoing is true and correct.

Executed this 28th day of June, 2023.

Andrea Vidaurre

.

8

# Exhibit 3 – Declaration of Yasmine Agelidis

## DECLARATION OF YASMINE AGELIDIS

I, Yasmine Agelidis, hereby declare and state as follows:

1.     I am an attorney in the Los Angeles office of Earthjustice. I represent proposed Environmental Justice Intervenors East Yard Communities for Environmental Justice and People's Collective for Environmental Justice in the above-captioned matter.

2.     I submit this declaration in support of the Motion of Environmental Justice Organizations to Intervene in Support of Respondents. I am personally familiar with the factual bases for the following assertions and have sufficient knowledge to competently attest to them.

3.     On June 26, 2023, I emailed counsel for Petitioners Western States Trucking Association, Inc. and Construction Industry Air Quality Coalition, Inc. (Case No. 23-1143) requesting their clients' position on this intervention motion. Counsel did not respond to this request.

4.     On June 26, 2023, I conferred with counsel for Petitioners State of Iowa, State of Alabama, State of Arkansas, State of Georgia, State of Indiana, State of Kansas, State of Kentucky, State of Louisiana, State of Mississippi, State of Missouri, State of Montana, State of Nebraska, State of North Dakota, State of Ohio, State of Oklahoma, State of South Carolina, State of Utah, State of West

Virginia, and State of Wyoming, (Case No. 23-1144). Counsel conveyed that they would not oppose this intervention motion.

5.    On June 26, 2023, I emailed counsel for Petitioners Illinois Soybean Association, Iowa Soybean Association, Minnesota Soybean Growers Association, North Dakota Soybean Growers Association, Ohio Soybean Association, South Dakota Soybean Association, Clean Fuels Development Coalition, ICM, Inc., and Diamond Alternative Energy, LLC, (Case No. 23-1145) requesting their clients' position on this motion. Counsel did not respond to this request.

6.    On June 26, 2023, I conferred with counsel for Petitioners American Fuel & Petrochemical Manufacturers, Agricultural Retailers Association, American Petroleum Institute, American Royalty Council, California Asphalt Pavement Association, California Manufacturers & Technology Association, Consumer Energy Alliance, Domestic Energy Producers Alliance, Energy Marketers of America, Louisiana Mid-Continent Oil & Gas Association, National Association of Convenience Stores, Nevada Petroleum Marketers & Convenience Store Association, The Petroleum Alliance of Oklahoma, Texas Association of Manufacturers, Texas Oil & Gas Association, Texas Royalty Council, and Western States Petroleum Association, (Case No. 23-1146). Counsel conveyed that their clients take no position on this intervention motion.

2

7.      On June 26, 2023, I emailed counsel for Petitioners The 200 for Homeownership, The 60 Plus Association, Orange County Water District, and Mesa Water District, (Case No. 23-1147) requesting their clients' position on this intervention motion. Counsel did not respond to this request.

8.      On June 26, 2023, I emailed counsel for Petitioner Owner-Operator Independent Drivers Association, Inc., (Case No. 23-1148) requesting their client's position on this intervention motion. Counsel did not respond to this request.

9.      On June 26, 2023, counsel for Respondents U.S. Environmental Protection Agency ("EPA") and Michael S. Regan, in his official capacity as Administrator of the EPA, indicated that the United States takes no position on this intervention motion.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 29th day of June, 2023.

_____

Yasmine Agelidis